Craig R. Mariger (USB #2083)
Lewis M. Francis (USB #6545)
Elizabeth M. Butler (USB #13658)
Christian A. Vanderhooft (USB #17335)
**JONES, WALDO, HOLBROOK & McDONOUGH, P.C.**
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101
Telephone:  801-521-3200
cmariger@joneswaldo.com
lfrancis@joneswaldo.com
lbutler@joneswaldo.com
cvanderhooft@joneswaldo.com

*Attorneys for Petitioners Nu Skin Enterprises, Inc. and Pharmanex, LLC*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NU SKIN ENTERPRISES, INC. a Delaware corporation, and PHARMANEX, LLC, a Delaware limited liability company,<br><br>Petitioners,<br><br>v.<br><br>EARNEST L. RAAB, D.C., d/b/a SUCCESS TO SIGNIFICANCE LLC, a Washington LLC; MICHAEL ULRICK; LARRY C. WIEBER and ROSE WEIBER, d/b/a TEST FOR NUTRITION OF WASHINGTON, LLC, a Washington LLC; MAX and DEBRA ROBBINS; TONI RAGSDALE, d/b/a RAGSDALE & COMPANY LLC, an Oklahoma LLC; WAYNE MATECKI, LAC and AMY L. MATECKI, M.D., d/b/a DR. AMY'S INTEGRATIVE MEDICINE, INC., a California corporation<br><br>Respondents. | **DECLARATION OF BRIAN P. MUIR IN SUPPORT OF PETITION TO COMPEL ARBITRATION AND ENJOIN RESPONDENTS' PROSECUTION OF STATE COURT ACTION**<br><br>Case No.: 2:21-cv-00709-RJS<br><br>Judge: Robert J. Shelby |

Brian P. Muir hereby testifies as follows:

1. I make the following Declaration in support of the Petition to Compel Arbitration and Enjoin Respondents' Prosecution of State Court Action, filed in this action by petitioners Nu Skin Enterprises, Inc. and Pharmanex, LLC. This Declaration is based on my own personal knowledge, and, where indicated, based on my view of the records of Nu Skin (as defined below) that are maintained in the ordinary course of business. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify to the matters stated herein.

2. I am the Vice President of Global Compliance for Nu Skin Enterprises United States, Inc. ("NSEUS") and Nu Skin International, Inc. ("NSI"), which are wholly-owned subsidiaries of Petitioner Nu Skin Enterprises, Inc. ("NSE"). NSE, NSEUS, and NSI are collectively referred to herein as "Nu Skin."

3. I reside in Salt Lake County, Utah. I have been employed by one or more of the Nu Skin entities over the last thirty (30) years, and have been in charge of Nu Skin's compliance department since 1995.

4. Nu Skin markets beauty and nutritional products in the United States and worldwide through a direct-sales, multi-level marketing network of independent contractor distributors (the "Nu Skin Business").

5. Nu Skin has over 500,000 distributors throughout the world, and over 100,000 distributors in the United States alone.

6. In my capacity as Vice President of Global Compliance, I regularly maintain and/or have access to all of Nu Skin's contracts and related correspondence with Nu Skin distributors. I

also have access to Nu Skin's corporate records, kept in the ordinary course of its business, including records of name changes and reorganization documents. Incident to the preparation of this Declaration, I have also located and reviewed the relevant correspondence and agreements between Nu Skin and the Respondents in this case.

**A.   THE RELATED NU SKIN ENTITIES**

7.   By way of background, NSE is a publicly-traded company formed in the State of Delaware, and is the owner of the Nu Skin Business.

8.   NSEUS is wholly-owned by NSE, and is the corporate entity which contracts with Nu Skin distributors in the United States. NSEUS is also the successor in interest to Nu Skin United States, Inc., and is known and sometimes referred to as "Nu Skin U.S.A."

9.   NSI is also wholly-owned by NSE, and is the corporate entity which contracts with Nu Skin's international distributors, as well as U.S. distributors who want to conduct business in international markets.

10.   Pharmanex, LLC ("Pharmanex") is a Delaware limited liability company, with its principal place of business in Provo, Utah. Pharmanex is wholly-owned by NSI, and is indirectly owned and controlled by NSE.

11.   Prior to the year 2000, there was also Nu Skin-related corporation by the name of Nu Skin USA, Inc. Nu Skin, USA, Inc.'s name, however, was officially changed to Maple Hills Investment, Inc. on July 7, 1999. True and correct copies of the documents filed in the states of Utah and Delaware referencing the official name change are attached hereto as <u>Exhibit 1</u>.

12.   In addition, pursuant Section 2.1.1(d) of a 1999 Asset Purchase Agreement, Nu Skin United States, Inc. (now NSEUS) acquired the right to use the name "Nu Skin USA" from

Nu Skin USA, Inc. A true and correct copy of the March 8, 1999 Asset Purchase Agreement is attached hereto as Exhibit 2.

**B.     THE WASHINGTON STATE COURT COMPLAINT**

13.     On November 15, 2021, respondents Earnest L Raab, D.C., d/b/a Success to Significance, LLC ("Raab"); Michael Ulrick ("Ulrick"); Larry C. Wieber and Rose Wieber, d/b/a Test for Nutrition of Washington, LLC (the "Wiebers"); Max and Debra Robbins (the "Robbins"); Toni Ragsdale, d/b/a Ragsdale & Company LLC ("Ragsdale"); and, Wayne Matecki, LAC and Amy L. Matecki, M.D., d/b/a Dr. Amy's Integrative Medicine, Inc. (the "Mateckis") (collectively, "Respondents") filed a complaint against NSE, Pharmanex, and a number of other named defendants, in Washington State Court (the "Washington State Court Complaint"), a copy of which is attached as Exhibit "A" to the Petition to Compel Arbitration and Enjoin Respondents Prosecution of State Court Action.

14.     All of the Respondents, with the exception of Debra Robbins, are current Nu Skin distributors.

15.     Upon information and belief, Debra Robbins is the wife of Respondent Max Robbins, who has been a Nu Skin Distributor for over fifteen years. Debra Robbins is also a Nu Ski "member", who is allowed to purchase Nu Skin products at wholesale prices but without any right to resell those products.

16.     Other than NSE and Pharmanex, the other defendants named in the Washington State Court Complaint are all current or former Nu Skin distributors, including Weston Blatter; Scott Bennett; Tyler Bennett, d/b/a Leadership, Inc. and d/b/a For Our Future, Inc.; Vladimir Kolbas; Vladimir Kolbas, d/b/a Build Belief, LLC; Estee and Blake Carter, d/b/a Orange Goose,

LLC, Orange Goose Central, LLC, and Orange Goose Partners, LLC; William Jonathan Whittaker and Kathie Ann Whittaker, d/b/a Pharmanexmd, LLC; Latisha Danielle Taylor, d/b/a Heath Measured Ventures, LLC; Stephen Moore, D.C., d/b/a Live Better Longer MD, LLC, d/b/a MD Solution, and d/b/a Get Healthy, USA.

C. **RESPONDENTS AGREED TO ARBITRATE THE DISPUTES RAISED IN THE WASHINGTON STATE COURT COMPLAINT**

   1. **Overview of the Nu Skin Distributor Agreements and the Nu Skin Policies and Procedures**

17. Given the nature of its business and the number of its distributors, Nu Skin uses form Distributor Agreements, which are modified from time to time, and which are generally referred to herein as one or more "Nu Skin Distributor Agreements". The relevant Nu Skin Distributor Agreements, and the pertinent provisions thereof, are discussed more fully below.

18. Nu Skin also has written Policies and Procedures, which, as set forth more fully below, are specifically incorporated into the Nu Skin Distributor Agreements, and are expressly made a part of the parties' "Contract." The Nu Skin Distributor Agreements, together with the Nu Skin Policies and Procedures and other documents expressly referred to in the Nu Skin Distributor Agreements, govern the relationship between Nu Skin and the Nu Skin distributors.

19. Nu Skin occasionally updates its Policies and Procedures as changes in the direct selling industry, Nu Skin's business operations, and/or the law require. In the last twenty years, Nu Skin has amended its Policies and Procedures in 2001, 2010, and again in 2018. The relevant Nu Skin Policies and Procedures, and the pertinent provisions therein, are discussed more fully below.

20. As referenced below, under each version of the Nu Skin Policies and Procedures, distributors were notified and agreed that Nu Skin would make updates and/or changes to the Policies and Procedures from time to time. When updates are made, all distributors are given thirty (30) days advance notice. This notice occurs in a number of ways, simultaneously and repeatedly, including, through email, through social media platforms such as Facebook Groups, through telephone calls, and through the public-facing Nu Skin website, and through the back office of the Nu Skin website, which is a part of the website just for distributors.

21. In addition, the current Nu Skin Policies and Procedures are always available for review by its distributors on Nu Skin's website – both on the publicly-available and back-office, Nu Skin distributor-only pages.

**2. Respondents Ulrick, The Robbins, Ragsdale, The Wiebers and The Mateckis Each Entered Into Nu Skin Distributor Agreements Containing Binding Agreements To Arbitrate All Disputes**

22. Between 2011 and 2018, Ulrick, Max Robbins, Ragsdale, the Wiebers, and the Mateckis each entered into Nu Skin Distributor Agreements containing binding agreements to arbitrate all disputes between them and Nu Skin or its affiliate companies, and/or between Respondents and other Nu Skin distributors.

23. Ulrick entered into a Nu Skin Distributor Agreement on or about August 24, 2018, a true and correct copy of which is attached hereto as Exhibit 3 (the "Ulrick DA").

24. Max Robbins entered into a Nu Skin Distributor Agreement dated November 28, 2017, a true and correct copy of which is attached hereto as Exhibit 4 (the "Robbins DA").

25. Ragsdale entered into a Nu Skin Distributor Agreement dated April 17, 2017, a copy of which is attached hereto as Exhibit 5 (the "Ragsdale DA").

1769496.1

26. The Wiebers entered into a Nu Skin Distributor Agreement dated March 31, 2011, a copy of which is attached hereto as <u>Exhibit 6</u> (the "Wieber DA").

27. The Mateckis entered into a Nu Skin Distributor Agreement dated September 16, 2011, a copy of which is attached hereto as <u>Exhibit 7</u> (the "Matecki DA").

28. Because the copies of the signed Ulrick DA, Robbins DA, Ragsdale DA, Wieber DA and the Matecki DA maintained by Nu Skin are, in some instances, difficult to read and/or missing pages, also attached hereto as <u>Exhibit 8,</u> <u>Exhibit 9</u>, and <u>Exhibit 10</u> are true and complete copies of the 2010, 2012, and 2017 form Nu Skin Distributor Agreements signed by those Respondents, which are identical as to the provisions quoted below.

29. The Ulrick DA, the Robbins DA, the Ragsdale DA, the Wieber DA and the Matecki DA each contain an identical arbitration provision, which states, in pertinent part, as follows:

> 1. THIS CONTRACT IS SUBJECT TO ARBITRATION. UTAH WILL BE THE EXCLUSIVE VENUE FOR ARBITRATION OR ANY OTHER RESOLUTION OF ANY DISPUTES ARISING UNDER OR RELATED TO THIS CONTRACT. The place of origin of this Contract is the State of Utah, USA, and it will be governed by, construed in accordance with, and interpreted pursuant to the laws of Utah, without giving effect to its rules regarding choice of laws. The exclusive venue for any and all Disputes will be in Salt Lake County, Utah. I consent to the personal jurisdiction of any courts within the State of Utah and waive any objection to improper venue.
>
> 2. I agree that any Dispute will be resolved and settled in accordance with and pursuant to the terms and conditions of this Contract, and by the rules and procedures set forth in Chapter 7 (Arbitration) of the Policies and Procedures or may be viewed online in My Office section of a company website. The arbitration proceeding will be conducted in Salt Lake City, Utah. . . .
>
> 3. A "Dispute" is defined as any and all past, present or future claims, disputes, causes of action or complaints, whether based in contract, tort, statute, law, product liability, equity, or any other

> cause of action, (1) arising under or related to this Contract, (ii) between other Distributors and me arising out of or related to a Distributorship, or our business relationship as independent contractors of the [sic] Nu Skin, (iii) between Nu Skin and me, (iv) related to Nu Skin or its past or present affiliated entities, their owners, directors, officers, employees, investors or vendors, (v) related to the Nu Skin Products, (vi) regarding Nu Skin's resolution of any other matter that impacts my Distributorship, or that arises out of or is related to the Company's business, including my disagreement with Nu Skin's disciplinary actions or interpretations of this Contract.

Ulrick DA, p. 3, Section D, 1-3; Robbins DA, p. 3, Section D, 1-3; Ragsdale DA, p. 3, Section D, 1-3; Wieber DA, p. 3, Section D, 1-3; and Matecki DA, p. 3, Section D, 1-3.

30. The Ulrick DA, the Robbins DA, the Ragsdale DA, the Wieber DA and the Matecki DA each define "Nu Skin" to mean NSEUS, NSI, "and their affiliated companies." Ulrick DA, p. 2; Robbins DA, p. 2; Ragsdale DA, p. 2; Wieber DA, p. 2; Matecki DA, p. 2.

31. The Ulrick DA, the Robbins DA, the Ragsdale DA, the Wieber DA and the Matecki DA each define the respective parties' "Contract" to mean:

> the agreement between Nu Skin and me composed of this Distributor Agreement (Section B), the International Sponsor Agreement (Section C), the Mandatory and Binding Arbitration Agreement (Section D), Miscellaneous Provisions (Section E), ***the Policies and Procedures***, the Sales Compensation Plan, and materials pertaining to optional programs, as each may be amended, and are incorporated herein by reference.

Ulrick DA, p. 2, Section A; Robbins DA, p. 2, Section A; Ragsdale DA, p. 2, Section A; Wieber DA, p. 2, Section A; Matecki DA, p. 2, Section A.

32. When Ulrick, the Robbins, Ragsdale, the Wiebers and the Mateckis first entered into their respective Nu Skin Distributor Agreements, Nu Skin's 2010 Policies and Procedures (the "2010 Policies") or, in the case of Ulrick, Nu Skin's 2018 Policies and Procedures (the "2018

Policies"), were in effect. Attached hereto as <u>Exhibit 11</u> and <u>Exhibit 12</u> are true and correct copies of the 2010 Policies and 2018 Policies, respectively.

33. Chapter 8, Section 1.1 and Chapter 6, Section 1 of the 2010 Policies reserved to Nu Skin the right to modify the Contract. Chapter 8, Section 1.1 reads as follows:

> The Company expressly reserves the right to make any modifications to the Contract upon 30 days notice by publication on the Company's websites, normal channels of communication with Distributors, or as provided in Section 1.6 of this Chapter 8. [Distributors] agree that 30 days after such notice, any modification becomes effective and is automatically incorporated into the Contract between [Distributor] and the Company as an effective and binding provision. By continuing to act as a Distributor, engaging in any Business Activity, or accepting any Bonus after the modifications have become effective, [Distributor] acknowledge[s] acceptance of the new Contract terms.

2010 Policies, p. 26, Ch. 8 § 1.1.

34. Consistent with Chapters 8 and 6 of the 2010 Policies, Nu Skin modified its Contract with the Robbins, Ragsdale, the Wiebers, and the Mateckis when it issued its amended 2018 Policies. After receiving notice of Nu Skin's amended Policies and Procedures in 2018, the Robbins, Ragsdale, the Wiebers, and the Mateckis continued to act as Nu Skin distributors, and continued to engage in Business Activity, including accepting Bonuses.

35. The 2018 Policies are the currently applicable Nu Skin Policies & Procedures, which are incorporated into the Ulrick DA, the Robbins DA, the Ragsdale DA, the Wieber DA and the Matecki DA.

36. With the exception of certain changes in terminology, including a new reference to Nu Skin distributors as "Brand Affiliates," and a new reference to Nu Skin distributorships as "Brand Affiliate Accounts," the 2018 Policies are substantially identical to the 2010 Policies. Compare, Exhibit 11 to Exhibit 12.

9

37. Chapter 7 of the 2018 Policies and the 2010 Policies, which are identical (save the changes in certain terminology discussed above), contain additional terms regarding the parties' agreement to arbitrate all disputes. Specifically, Chapter 7, Section 2 of the 2010 Policies and the 2018 Policies state that: "YOU AND THE COMPANY AGREE THAT MANDATORY AND BINDING ARBITRATION IS THE SOLE MEANS TO RESOLVE ANY AND ALL DISPUTES. YOU WAIVE ALL RIGHTS TO JURY OR COURT TRIALS TO RESOLVE A DISPUTE." 2018 Policies, p. 25, Ch. 7 § 2; 2010 Policies, p. 25, Ch. 7, § 2.

38. "Dispute" is defined in Chapter 7 of the 2018 Policies and the 2010 Policies as follows:

> ANY AND ALL PAST, PRESENT, OR FUTURE CLAIMS, DISPUTES, CAUSES OF ACTION OR COMPLAINTS, WHETHER BASED IN CONTRACT, TORT, STATUTE, LAW, PRODUCT LIABILITY, EQUITY, OR ANY OTHER CAUSE OF ACTION, (I) ARISING OUT OF OR RELATED TO THIS CONTRACT, (II) BETWEEN YOU AND OTHER BRAND AFFILIATES ARISING OUT OF OR RELATED TO A BRAND AFFILIATE ACCOUNT, OR YOUR BUSINESS RELATIONSHIPS AS INDEPENDENT CONTRACTORS OF THE COMPANY, (III) BETWEEN YOU AND THE COMPANY, (IV) RELATED TO THE COMPANY OR ITS PAST OR PRESENT AFFILIATED ENTITIES, THEIR OWNERS, DIRECTORS, OFFICERS, EMPLOYEES, INVESTORS, OR VENDORS, (V) RELATED TO THE PRODUCTS, (VI) REGARDING THE COMPANY'S RESOLUTION OF ANY OTHER MATTER THAT IMPACTS YOUR BRAND AFFILIATE ACCOUNT, OR THAT ARISES OUT OF OR IS RELATED TO THE COMPANY'S BUSINESS, INCLUDING YOUR DISAGREEMENT WITH THE COMPANY'S DISCIPLINARY ACTIONS OR INTERPRETATIONS OF THE CONTRACT.

2018 Policies, p. 25, Ch. 7 § 3; 2010 Policies, p. 25, Ch. 7 § 3.

39. As stated in Chapter 7, Section 6.1 of both the 2018 and the 2010 Policies, the arbitration is required to be conducted before a single arbitrator, pursuant to the provisions of the Utah Uniform Arbitration Act, in Salt Lake City, Utah. *See* 2018 Policies, p. 26, Ch. 7 § 6.1; 2010 Policies, p. 25, Ch. 7 § 6.1.

40. In addition, both the 2018 and 2010 Policies define "Company" to mean "Nu Skin Enterprises United States, Inc. and its affiliated entities." 2010 Policies, p. 28, Addendum A; 2018 Policies, p. 31, Addendum A.

41. As previously noted, Petitioner Nu Skin Enterprises, Inc. (NSE) is the parent company of Nu Skin Enterprises United States, Inc. (NSEUS), and Nu Skin International, Inc. (NSI). In turn, Petitioner Pharmanex, LLC, is owned and controlled by NSI directly, and by NSE indirectly.

42. In sum, Petitioners Nu Skin Enterprises, Inc. (NSE), and Pharmamex, LLC, are affiliated entities of Nu Skin Enterprises United States, Inc. (NSEUS).

**3. Respondent Raab Also Agreed to Arbitrate All Disputes**

43. Raab first became a Nu Skin distributor with his partner Calvin A. French ("French") pursuant to a Nu Skin Distributor Agreement dated January 11, 2005, a copy of which is attached hereto as <u>Exhibit 13</u> (the "2005 Raab DA").

44. As stated in the 2005 Raab DA:

> *NOTE: My signature indicates that, in order to become an independent Distributor of the Company's products and services, I have read and agree to the terms and conditions set forth in the following documents which comprise the Contract: the Distributor Agreement, the Sales Compensation Plan, the Policies and Procedures; and if applicable, the Partnership/Corporation form; supplemental services, and division specific program assessments.

2005 Raab DA, p. 1.

45. The 2005 Raab DA was completed on the 2001 form Nu Skin Distributor Agreement, which had both a front and backside, a true and correct copy of which is attached hereto as <u>Exhibit 14.</u>

46. The Nu Skin Policies and Procedures in effect when the 2005 Raab DA was signed were Nu Skin's 2001 Policies and Procedures, a true and correct copy of which are attached hereto as Exhibit 15 (the "2001 Policies").

47. Section 30B of the 2001 Policies states that "mandatory and binding arbitration is the sole means to resolve disputes." In addition, this arbitration provision covers "any disputes with the Company or between Distributors, which may arise under the Contract," "disputes arising out of the independent contractor relationship between the Company and its independent contractors," as well as "in the event a Distributor disagrees with any disciplinary action or interpretation of the Contract by the Company." 2001 Policies, p. 18, § 30B.

48. Nu Skin's 2001 Policies define "Company" to include "Nu Skin USA, Nu Skin Personal Care, Pharmanex, and Big Planet." 2001 Policies, p. 3, § 1.

49. In 2007, Raab added an additional partner, George Burnett ("Burnett"), by combining their Nu Skin distributorships. Incident thereto, Raab, French, and Burnett entered into a January 30, 2007 Agreement with NSI, a copy of which is attached hereto as Exhibit 16. Pursuant thereto, Raab agreed "to comply with a newly signed and current Distributor Agreement" with Nu Skin, and to be bound by Nu Skin's "current policies and procedures." Agreement, p.1, §§ 3–4.

50. As a result, on January 30, 2007, Raab and his partners signed and sent to Nu Skin an amended Nu Skin Distributor Agreement, a copy of which is attached hereto as Exhibit 17 (the "2007 Raab DA").

12
1769496.1

51.     The 2007 Raab DA was also completed on the 2001 form Nu Skin Distributor Agreement, and therefore has the same terms and conditions as the 2005 Raab DA, including but not limited to its arbitration provision.

52.     In or about 2011, a dispute arose between Raab and his partners over their Nu Skin distributorship.  To resolve that dispute, "the Parties entered into arbitration in accordance with the Policies and Procedures of Nu Skin." *See* March 7, 2011 Settlement Agreement, Release and Assignment of Interest, p. 1, attached hereto as <u>Exhibit 18</u> (the "Raab Settlement").

53.     Raab and his partners thereafter settled their claims, whereby French and Burnett relinquished their interest in Raab's Nu Skin distributorship, and Burnett obtained a separate Nu Skin distributorship.  *See* Raab Settlement, ¶¶ 2, 4, 6.

54.     On March 17, 2011, following execution of the Raab Settlement, Raab faxed to Craig Blackwell, Nu Skin's Account Manager, a written request to amend his Nu Skin Distributor Agreement, to which he also included his wife Cheryl Raab.  Included with that faxed request were the completed first page of an amended Nu Skin Distributor Agreement, and the signature page of an amended Nu Skin Business Entity form, copies of which are attached hereto as <u>Exhibit 19</u> (the "Raab Amended DA").

55.     Page 1 of the Raab Amended DA states that the agreement includes a "Mandatory and Binding Arbitration Agreement."  *See* Raab Amended DA, p. 1.

56.      The Raab Amended DA was submitted on the first page of the 2011 form Nu Skin Distributorship Agreement, a three-page contract containing the same Mandatory and Binding Arbitration Agreement in page 3 as in the Ulrick DA, the Robbins DA, the Ragsdale DA, the Wieber DA, and the Matecki DA, and which provision is quoted in paragraph 29 of this

13

declaration. For reference, attached hereto Exhibit 20 is a redacted Nu Skin Distributorship Agreement from another Nu Skin distributor using the same 2011 form, the first page of which matches the first page of the Raab Amended DA.

57. Page 2 of the 2011 form Nu Skin Distributor Agreement submitted as the Raab Amended DA contains the same definitions that are contained in the Ulrick DA, the Robbins DA, the Ragsdale DA, the Wieber DA, and the Matecki DA, and are quoted in paragraphs 30 and 31 of this declaration.

58. In signing the Amended Raab DA, Earnest Raab and Cheryl Raab each affirmed that they had "read and accepted all of the terms and conditions detailed in the Contract," and that "each individual will comply with the terms and conditions of the Contract." Raab Amended DA, p. 2, at Exhibit 19.

59. Section 23 of the Nu Skin Policies & Procedures in effect when Raab first became a Nu Skin distributor in 2005, and when he entered into an amended Distributor Agreement in 2007, also reserved to Nu Skin the right to modify the Contract as follows:

> The Company reserves the right to make any modifications to the Contract upon thirty days prior written notice in Company publications, by separate mailing, or through publication on the Company websites: www.nuskin.com, www.pharmanex.com, and www.bigplanet.com. Each Distributor agrees that thirty days after publication of that notice, any modification becomes effective and is automatically incorporated into the Contract between the Company and its corresponding Distributors as an effective and binding provision. By continuing to act as a Distributor, or engaging in any Distributorship activity … after the modifications have become effective, a Distributor acknowledges acceptance of the new Contract terms.

2001 Policies, p. 17, § 23.

1769496.1

60. On October 1, 2010, Nu Skin issued its 2010 Policies, and on June 1, 2018, Nu Skin issued its 2018 Policies.

61. After receiving notice of Nu Skin's 2010 Policies and Procedures, Raab entered into the Amended Raab DA in March 2011.

62. After receiving notice of the 2018 Policies, Raab also continued to act as a Nu Skin distributor, and to engage in Business Activity, including accepting Bonuses from Nu Skin.

I declare under penalty of perjury under the laws of the State of Utah that the foregoing is true and correct.

DATED this 1st day of December, 2021.

By: */s/ Brian Muir*
*Signed with permission, copy being maintained in the office of Attorneys for Defendants*